# EXHIBIT A

1

```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,.    Case No. 2:21-MJ-00220
                            .
           Plaintiff,       .
                            .          James A. Byrne U.S. Courthouse
      v.                    .          601 Market Street
                            .          Philadelphia, PA 19106
MICHAEL JOHN LOPATIC, SR.. .
                            .
                            .
           Defendant.       .
                            .          February 9, 2021
. . . . . . . . . . . . ..             12:25 p.m.

                   TRANSCRIPT OF BAIL STATUS HEARING
                  BEFORE HONORABLE HENRY S. PERKIN
                   UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For The United States      TIMOTHY STENGEL, ESQ.
  Of America:              Assistant United States Attorney
                           U.S. ATTORNEY'S OFFICE
                           615 Chestnut St. Suite 1250
                           Philadelphia, DR. PATEL: 19106

For Michael John           MYTHRI JAYARAMAN, ESQ.
  Lopatic, Sr.:            FEDERAL COMMUNITY DEFENDER
                           601 Walnut Street, Suite 540
                           Philadelphia, PA 19106


Audio Operator:            J. CRUZ

Transcriber:               UBIQUS REPORTING, INC.
                           61 Broadway, Suite 1400
                           New York, NY 10006
                           212-346-6666
                           Email: infousa@ubiqus.com


              Proceedings recorded by electronic sound
     recording, transcript produced by transcription service.
```

2

```
 1              THE CLERK:  This is one of the Rule 5's.
 2              THE COURT:  All right, bear with me one second.
 3  Labetti?
 4              THE CLERK:  Lopatic, L-O-P-A-T-I-C.
 5              THE COURT:  Okay, sorry.  That's what I thought.  All
 6  right, bear with me one second.
 7              THE CLERK:  He had his initial appearance already.
 8              THE COURT:  Yes, I see there was a temporary
 9  detention order.  I think the only thing before me is
10  detention.  Is there also a probable cause issue?
11              MR. TIM STENGEL:  Your Honor, good afternoon, it's
12  Tim Stengel on behalf of the United States.  I understand that
13  we have a stipulation as to identity and there is no probable
14  cause issue because Mr. Lopatic was indicted in the District of
15  Columbia.
16              MS. MYTHRI JAYARAMAN:  And Your Honor, just to
17  clarify, with the stipulation to identity, it goes without
18  saying, the stipulation is to identity for purposes of this
19  hearing.  (inaudible) is not willing--
20              THE COURT:  --My screen totally went blank, and Mr.
21  Stengel was in the middle of explaining to me that I think this
22  is by indictment, did you say?  That there's no issue of
23  probable cause?
24              MR. STENGEL:  Yes, Your Honor.  Mr. Lopatic was
25  indicted in the District of Columbia.  We are stipulating to
```

1  identity for purposes of this hearing only, so the only issue

2  before Your Honor is the issue of detention.

3         THE COURT:  How can you only stipulate--wait a

4  minute.  How can you only stipulate to identity for this

5  hearing?  If you stipulate to identity, I'm going to grant your

6  motion for removal, and then he's in the District of Columbia.

7  You mean he's going to then say he's not who he is in the

8  District of Columbia?  Is that what he's reserving the right to

9  do?

10         MS. JAYARAMAN:  Your Honor, if I--

11         THE CLERK:  Hold on.  He hasn't even put this on the

12  record yet, so you guys are getting--

13         THE COURT:  --Yeah, you're right.

14         THE CLERK:  --into it, aren't you?  So he hasn't even

15  put the action on or anything, so.

16         THE COURT:  Hold on, all right.  Bear with me,

17  everybody here.  I just got--all right, let--and then I'll

18  announce the case.  Okay.  All right, this is the matter of

19  United States of America vs. Michael John Lopatic, Sr. and it

20  is #21-MJ-00220 in this district.  In the District of Columbia

21  it bears #21-CR-00035.  The matter before me is the

22  Government's motion for removal to the District of Columbia,

23  and that gives rise to a hearing or determination of identity.

24  The other matter is if I grant removal, then the question is

25  whether or not he shall be detained or may appear in the

4

1    District of Columbia at liberty.  Has counsel been appointed

2    for--or does counsel have--do we have counsel for Mr.--

3             REPORTER:  I think you froze for a second.

4             THE COURT:  Has counsel been appointed for Mr.

5    Lopatic?

6             MS. JAYARAMAN:  Good afternoon, Your Honor.  Mythri

7    Jayaraman for the Federal Defenders on behalf of Mr. Lopatic.

8             THE COURT:  Oh, okay.  Just wanted to make sure that

9    that took place.  All right, Mr. Stengel, before I identified

10   the case and went on the record, you indicated that there is a

11   stipulation to identity in this district only.  First of all,

12   is that correct?

13            MR. STENGEL:  Your Honor, it's a stipulation to

14   identity.  If the defense is going to preserve it for this

15   hearing only, I understand that's their position.

16            THE COURT:  Well, all right.  Just so I understand,

17   let's get the record correct.  He admits that today that he is

18   Michael John Lopatic, Sr., the same individual who was charged

19   by indictment in the United States District Court for the

20   District of Columbia, and that's at #21-CR-0035.  On that

21   basis, I will grant--he shall appear in the--

22            REPORTER:  Judge--

23            THE COURT:  Okay, now just so we're clear for the

24   record, Ms. Jayaraman, you're only admitting identity for the

25   proceedings today to remove him to the District of Columbia, is

1    that what you're telling me?

2            MS. JAYARAMAN:  Your Honor, we're stipulating to his

3    identity, and we're stipulating that he is in fact the same

4    Michael John Lopatic who was indicted out of D.C., that he is

5    that same person.  I just want to make the record that he is

6    not stipulating as to that he is the same person who may appear

7    in various photographs, videos, et cetera, from the actual

8    incident.

9            THE COURT:  Oh, okay, all right, that's fine, because

10   he--once he agrees he is who is with regard to the indictment

11   here today, he--I guess he could try, but he's--this has been a

12   judicial determination that's been made.  But I understand your

13   point.  Your point is an evidentiary one, and I'm not deciding

14   the evidentiary today.  Okay.  That brings us to the question

15   of pretrial detention.  The United States is--which I believe

16   all parties have received as well, am I correct?

17           MR. STENGEL:  Yes, Your Honor, we did file a

18   detention motion and it was served on counsel.

19           MS. JAYARAMAN:  That's correct.

20           THE COURT:  All right.  Mr.--

21           REPORTER:  Uh-oh.

22           FEMALE VOICE:  Please enter your area code and phone

23   number, followed by pound.  Welcome to a Cisco meeting.  You

24   are entering the meeting now.

25           REPORTER:  Excuse me, hold on.  Hold on, time out.

6

```
1   This is Jimmy Cruz, the Court Reporter.  We need to go back.  I
2   lost the feed here.  The last thing I had here was the judge
3   found probable cause, grant Government pretrial--oh, no, wait a
4   minute.  Hold on.  It was evidentiary pretrial detention AUSA
5   Stengel filed, and that was the last I got.  That was Mythri
6   Jayaraman that was speaking.  Mythri Jayaraman was speaking.
7            THE COURT:  All right, so the record is clear, that's
8   our court reporter, Jimmy Cruz, in this matter.  The United
9   States of America is represented by Assistant United States
10  Attorney Timothy Stengel, and the Defendant is represented by
11  attorney Mythri Jayaraman.  Okay, let's go back.  We're going
12  to start the detention motion filed by the United States, and
13  Mr. Stengel will begin with his proffer and argument.
14            MR. STENGEL:  Thank you, Your Honor.  As you know,
15  the Defendant, Michael Lopatic, has been indicted for his role
16  in the riot at the United States Capitol on January 6th, 2021.
17  But to start a couple months prior to that, however, shortly
18  after the November presidential election, Mr. Lopatic posted to
19  social media the phrase "a call to arms".  In the days
20  following the election, he posted several images to his
21  Facebook account showing dead birds that he himself had shot
22  and named those birds after elected leaders in Washington, D.C.
23  Fast forward a few weeks.  Shortly before the events at the
24  Capitol, he posted the message, "Assemble at the capitol on
25  January 6th, 2021.  United we stand forth and we fight."  And
```

1    that's exactly what Mr. Lopatic did.  In a day full of

2    harrowing scenes, one of the most harrowing was the scene in

3    which a D.C. metro police officer was dragged from an archway

4    and engulfed by a violent mob.  Mr. Lopatic was right in the

5    middle of that.  In fact, when a second officer went to render

6    aid to the first officer, Mr. Lopatic charged him, gripped him

7    up and started punching him.  He then made his way down the

8    steps and stole the body camera from the first officer, but at

9    this point was being protected by a human shield of protesters.

10   Mr. Lopatic then left Capitol area and destroyed the body-worn

11   camera, or at least disposed it on his way home, and we know

12   that because when he was arrested on February 3rd at his home

13   in Lancaster, Pennsylvania, he acknowledged such to the agents

14   from the FBI.  He has demonstrated violent and obstructionist

15   behavior, Your Honor.  He has shown that he harbors ill-will

16   and has violent feelings toward elected officials in

17   Washington, and he is now being asked to be released on his own

18   recognizance to travel to Washington, to the scene of the

19   crime, to appear on the charges in this case.  Given--although

20   Mr. Lopatic has no criminal history, he is facing a substantial

21   sentence and I submit to you that given the fact that he has

22   not served time in jail before, any prison sentence is going to

23   give him a compelling reason to flee.  He has no ties to the

24   District of Columbia, and he has no recent work history.  For

25   all of these reasons, Your Honor, and those that we included in

```
 1    our detention motion, which included still shots from body
 2    camera footage taken from the day of the riot at the Capitol,
 3    the Government submits that Mr. Lopatic is a danger to the
 4    community and a risk of flight, and he should be detained
 5    pending his removal to the District of Columbia to answer the
 6    charges against him.
 7              THE COURT:  I've reviewed the motion as well as the
 8    photographs you've included in the motion.  Can I ask you, how
 9    did you identify--how do we know that even though it's not
10    necessarily--I'm not ruling upon this as if it was a trial, but
11    I'm curious as how you identified Mr. Lopatic as the individual
12    in the photos.
13              MR. STENGEL:  My understanding, Your Honor, it not
14    being my investigation, an AUSA out of the District of Columbia
15    charged it, but my understanding is that the FBI released
16    images that were not just from body camera footage, because
17    frankly, the body camera footage, at least the stills that we
18    included in the motion, are a little grainy.  There are much
19    clearer pictures from surveillance cameras at the Capitol, and
20    the FBI released a BOLO of Mr. Lopatic, and they received
21    information that he was the Michael John Lopatic living in
22    Lancaster, Pennsylvania.  To corroborate that, Your Honor, when
23    he was arrested, I don't believe there was any--when he was
24    talking to the officers, he certainly acknowledged disposing of
25    the body camera on that day.  So there's certainly evidence
```

1  beyond the detention motion that the gentleman you see in the

2  body camera footage is Mr. Lopatic.

3          THE COURT:  And my determination is not beyond a

4  reasonable doubt today, so--

5          MR. STENGEL:  Understood.

6          THE COURT:  --I understand.  Ms. Jayaraman, would you

7  like to respond, please?

8          MS. JAYARAMAN:  Yes, thank you, Your Honor.  If I can

9  sort of start with one of the Government's last points.  The

10  Government said he has no recent work history.  Frankly, Your

11  Honor, this is not because this is a man who is unwilling to

12  work.  He has no recent work history because this is an

13  individual who has stopped work to serve our country and is

14  receiving disability.  He was injured severely during a motor

15  explosion in Beirut.  He served overseas in the 1980s.  He was

16  a member of the Marine Corps.  He was stationed in Beirut.  I

17  believe he was there for about--in Beirut itself, about a year.

18  In fact, he was one of the last individuals who was there, Your

19  Honor, so even after the other marines and everyone else had

20  left, he was one of the last individuals who was still tasked

21  with staying there and sort of readying for the handover.  He

22  lost his hearing, he now uses hearing aids.  He's able to hear

23  in certain situations and not in others.  So to say he has no

24  recent work history, as if he--and that there is no tie to the

25  community, I think misses the point that the reason he can't

10

1   work is because of his significant ties and love for the

2   community.  If I may--

3           THE COURT:  Ms. Jayaraman, let me--may I say that I

4   am aware of that and I accept what you say because that was

5   what Mr. Stengel placed, actually, in his detention motion.

6           MS. JAYARAMAN:  Yes, Your Honor.

7           THE COURT:  On the disability.  So I understand

8   that's why he doesn't have a work history.  And I understand

9   that he has ties to the Eastern District of Pennsylvania.  I

10  understand all of that.

11          MS. JAYARAMAN:  Correct.

12          THE COURT:  And quite frankly, from what I've seen so

13  far, I could probably fashion conditions to deal with his

14  ability--you know, the risk of flight.  I think I probably

15  could do that.  That's not what my concern is.  My concern is

16  the danger.  And if you don't mind, I would suggest that--ask

17  that you address that.  And I do also find that Mr. Lopatic's--

18  focus on what occurred on January 6th of 2021.

19          MS. JAYARAMAN:  Your Honor--

20          THE COURT:  --would you please proceed with.  I

21  indicated that while I acknowledge and admire his service to

22  the United States, there's no way you can take that away from

23  him, I am going to focus in on the issue of danger as it arises

24  from--the facts that Mr. Stengel proffered from before January

25  6th, 2021, as well as what occurred at the Capitol on 2021--

1  January 6th, 2021.  So if you want to address that, I'd

2  appreciate it.  Thank you.

3            MS. JAYARAMAN:  Thank you, Your Honor.  I'll take

4  them exactly as Your Honor sort of refers to them.  So the

5  things that Mr. Stengel refers to from before January 6th refer

6  to posts that Mr. Lopatic made.  And I'll point out, yes, they

7  are absolutely distasteful.  There are photographs of dead

8  birds who he then named after members of Congress.  Clearly 1)

9  that's not illegal; and 2) that is very different, very

10 different from had he in fact had something--Your Honor, I

11 don't want to sort of do a comparison of The Horribles, but

12 this isn't--it's not as if he had photographs of actual people

13 or effigies of actual people, much less the individuals in

14 Congress, and then had done some sort of--something disgusting

15 like (inaudible) or anything like that.  So birds, which is

16 legal, yes, he then named the dead animals after members of

17 Congress who he clearly has a distaste for.  That's not a great

18 thing.  1) That's not illegal.  And I would say, in fact, the

19 proof that he wasn't doing anything violent is that the extent

20 of his violence is what he was bragging about online, which is

21 killing birds and using his dog to also go and kill and hunt

22 birds.  So there is no--it's not only that he didn't do

23 anything dangerous beforehand, there is no suggestion that he

24 wasn't even trying.  It's not as if he was trying to do

25 something dangerous beforehand and was also unsuccessful.  So

12

```
 1   what we know is he legally possessed weapons, he legally
 2   hunted, he used his dog as part of that hunting time.  He
 3   killed animals that I believe he was--I assume he was legally
 4   permitted to kill, and then he posted that--all of those images
 5   online, and then, yes, he named the already-dead animals after
 6   people he didn't like in Congress.  But we know that if he had
 7   wanted to do something dangerous, he certainly could have, and
 8   he did not.  Moving now to January 6th, which I understand, and
 9   the Government rightfully points to as the more salient
10   argument.  Your Honor, 1) obviously these are allegations.  2)
11   Even with these allegations, there is a reason that the
12   legislature has sort of determined certain things to be
13   presumption cases and certain things not to be presumption
14   cases.  And so of course I don't believe, and obviously please
15   correct me if I'm wrong, I don't believe this is a presumption
16   case because again, we're not here--Mr. Stengel is shaking his
17   head at me.  (inaudible).  But regardless--
18              THE COURT:  I don't think--when I looked at the act,
19   I don't think it's a presumption of detention case either.
20              MS. JAYARAMAN:  I don't--
21              MR. STENGEL:  --It's not a presumption case, Your
22   Honor.
23              MS. JAYARMAN:  Okay, good.
24              THE COURT:  It's not, yeah, okay.
25              MS. JAYARAMAN:  I wanted to make a--
```

13

1           THE COURT:  When he shook his head, he was agreeing

2  with you.

3           MS. JAYARAMAN:  Right.  I always like having Mr.

4  Stengel in agreement on my side.  It's not a presumption case,

5  not because the presumption is--obviously everybody is choosing

6  innocence, but the presumption on certain cases is that because

7  of either the penalty that person is facing of the conduct that

8  that person is alleged to have done, the presumption that that

9  individual will either be a danger to the community or a flight

10 risk weighs in favor of detention.  The legislature itself has

11 determined that the penalty that Mr. Lopatic is looking at

12 and/or the conduct that he's alleged to have done is not

13 meritorious of sort of presumed detention, unless there's some

14 extra reason.  The conduct described by the Government is

15 exactly what--

16          THE COURT:  Well, let me help you.  Congress says I

17 should release him unless I find there is a danger to the

18 community and I can't impose a condition or a combination of

19 conditions to satisfy that, if it's not a presumption case, and

20 it's not a presumption case.

21          MS. JAYARAMAN:  He missed--

22          THE COURT:  I mean, that's the basic framework of the

23 Act.

24          MS. JAYARAMAN:  Right.  He missed--he has a massive

25 brain tumor.  I'm sure the Court is aware he was--

14

1          THE COURT:  I was aware of that.

2          MS. JAYARAMAN:  He was in Marine Corps based in Camp

3  Lejeune when there were terrible incidents with the

4  contaminated water.  I think they had those issues from 1953 to

5  1987.  He in fact missed an appointment--he had an appointment

6  last Monday.  He takes medications.  I know he arrived at the

7  prison with (inaudible) pack of some medications.  At this

8  point the tumor is inoperable but they're keeping the swelling

9  down.  Every Friday he and his wife of 34 years were doing

10  these community meals.  If anything, January 6th was a terrible

11  glitch, but it is not indicative of his dangerousness, either

12  in the past or in the future.  It's not indicative of any kind

13  of future dangerousness.  As Your Honor says, there are

14  certainly conditions that can be fashioned to try and ensure

15  his presence, but if the Court wishes, perhaps the Court could

16  impose detention, some sort of heightened supervision, just to

17  make sure that there are closer tabs placed on him.  Certainly

18  he could be required to--I'm sure he's already required to give

19  up any weapons that may be in the house and could have

20  conditions--I have had clients where there are conditions

21  limiting their ability to be online.  So if the Court is

22  concerned about, perhaps, any online comments, that can be

23  restricted as well, Your Honor.

24          THE COURT:  Thank you.  Are you--do you have anything

25  further?

 1          MS. JAYARAMAN:  I don't, Your Honor.  I believe the

 2    Court is aware of everything else.

 3          THE COURT:  Okay.  First of all, the birds, I think,

 4    are effigies, okay, but that's not illegal.  I agree with you.

 5    Disliking members of Congress is not only not illegal, but it

 6    happens to be sport in this country.  So that itself isn't

 7    illegal.  But I don't--but it is relevant to what occurred on

 8    January 6th of 2021.  This was a breach of the Capitol for a

 9    purpose of impeding a democratic and constitutional function

10    that must take place.  Okay, so let's look at what the evidence

11    is against Mr. Lopatic.  If he was just entering or was in the

12    crowd, I wouldn't be so concerned.  But here's what concerns

13    me.  The assault on a police officer.  The assault on a police

14    officer under any conditions is something that brings a danger

15    to the community and puts--gives me pause as to whether or not

16    there should be release.  In this case, the attack on the

17    officers was for the purpose of getting into the Capitol and

18    stopping a democratic function that's constitutional and

19    necessary in order to elect a president of the United States.

20    That's serious stuff.  And in fact, the assault itself was

21    dangerous; it injured a police officer.  And the things that

22    led up to January 6th that Mr. Stengel has referred to aren't

23    simply his right to speech, which he has, but also an

24    indication of what his intention was on January 6th.  I find

25    that's a danger to the community, it was a danger to democracy,

16

1   it was a danger to the Capitol and the people that serve in

2   that Capitol, including the Capitol officers.  Now I'm going to

3   look to see whether or not there are conditions or a

4   combination of conditions that I can impose to solve that.  I

5   don't think there are, to be candid with you.  House arrest,

6   house incarceration will not do it because he can't be

7   supervised 24/7.  He has expressed his desires in the past--to

8   grant him to the custody of the United States Marshal Service

9   pending removal to the District of Columbia.  Mr. Lopatic can

10   raise this argument again before his (inaudible).

11          MR. JOHN LOPATIC:  Judge, may I speak?

12          THE COURT:  That's up to your counsel.

13          MS. JAYARAMAN:  Mr. Lopatic, I would strongly

14   recommend that you don't speak.  I would strongly recommend

15   that you exercise your right to remain silent.  My

16   recommendation.

17          MR. LOPATIC:  Well, I see the Judge seems to have

18   already made his mind up.

19          THE COURT:  So I've listened to the entire case.  I

20   haven't made my mind up without listening to the case.  Yes,

21   I've made my mind up at this point, that's correct.

22          MR. LOPATIC:  But if I may speak to you, please.

23   The--we weren't--when the Capitol was being breached, we

24   weren't there.  My wife and I took a walk in a different

25   direction.  If you can find a timeline of things that happened-

17

1   -

2           MS. JAYARAMAN:  Mr. Lopatic, Mr. Lopatic, listen.

3   When the Judge says he's made up his mind, he's not talking

4   about whether you're guilty or innocent.  He's literally just

5   saying he's made up his mind to keep you in custody until your

6   case is sent to D.C., all right?  I would not talk about the

7   facts of the case itself at the moment.

8           THE COURT:  Well, let me make it very clear.  Once

9   you are before the Court in the District of Columbia, you may

10  raise this issue again with the court there, the one that is

11  prosecuting you.  The court--or not the court that's

12  prosecuting you, but the court in which you are being

13  prosecuted.  But with the evidence in front of me, I believe

14  you should be kept in custody and I'm ordering that.  I also

15  want to make sure that you have all the medical treatment that

16  you need, and I'm going to ask Ms. Jayaraman to check and

17  report to me if in that's a problem, because I will take care

18  of that.

19          MS. LOPATIC:  Attorney Stengel made points about the

20  social media and so forth.  What he doesn't point out is the

21  fact that I saw his point as that I'm a very--like a pro-life

22  activist.  That's the only reason I--

23          MS. JAYARAMAN:  Ah, ah, Mr. Lopatic.

24          MR. LOPATIC:  It just seemed like--

25          MS. JAYARAMAN:  (inaudible) all of this.

18

1   (inaudible).

2           MR. LOPATIC:  I just feel like I don't have a chance

3   here.

4           THE COURT:  I have not determined guilt.  You still

5   have the presumption of innocence.  The statute says that.

6   This is a very limited function that I'm dealing with right now

7   and that's whether or not you should be kept in custody pending

8   your removal to the District of Columbia, and I'm specifically

9   telling you, you can raise this issue again when you get to the

10  District of Columbia.  Hopefully that will be sooner than

11  later.  I don't know what the schedule is with regard to that

12  Court.

13          MR. LOPATIC:  Well, I haven't been able to contact my

14  wife or anyone since I've been in custody.

15          THE COURT:  I don't know why that is.  That would be

16  the policy of the detention center, but Ms. Jayaraman, maybe

17  you can look into that, because I certainly think he should be

18  able to do that.

19          MS. JAYARAMAN:  I will, Your Honor.

20          THE COURT:  And if there's an issue, you may bring it

21  to me.  Is there anything further with regard to this matter

22  this afternoon?

23          MR. STENGEL:  Not from the Government, Your Honor.

24          THE COURT:  All right.

25          MS. JAYARAMAN:  No.

19

1          THE COURT:  This matter is concluded, and all those

2  involved in this issue are excused.  Thank you very much.

3          MS. JAYARAMAN:  (inaudible) in the interest of that.

4  Thank you, Your Honor.

5          THE COURT:  You're welcome.  Well argued by both

6  sides.

7                            *  *  *  *  *

# C E R T I F I C A T I O N

I, Julie Davids, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


*Julie Davids*

Julie Davids


DATE:  February 25, 2021