# EXHIBIT D

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Decided March 26, 2021

No. 21-3010

UNITED STATES OF AMERICA,
APPELLEE

v.

ERIC GAVELEK MUNCHEL,
APPELLANT

---

Consolidated with 21-3011

---

On Appeal of Pretrial Detention Orders
(No. 1:21-cr-00118-1)
(No. 1:21-cr-00118-2)

---

*A. J. Kramer*, Federal Public Defender, and *Sandra G. Roland*, Assistant Federal Public Defender, were on appellant Eric Munchel's Memorandum of Law and Fact.

*Gregory S. Smith*, appointed by the court, was on appellant Lisa Eisenhart's Memorandum of Law and Fact.

*Elizabeth Trosman* and *Elizabeth H. Danello*, Assistant U.S. Attorneys, were on appellee's Memorandum of Law and Fact.

2

Before: ROGERS, WILKINS and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* KATSAS.

WILKINS, *Circuit Judge*:  We consider an appeal of a pretrial detention order issued after a Magistrate Judge had previously ordered the two appellants released pursuant to a lengthy set of stringent conditions.  For the reasons stated below, we remand for the District Court to consider anew the government's motion for detention.

## I.

The facts, as found by the District Court, and as observed in a 50-minute video of much of the incident at the heart of the case, are as follows.

Eric Munchel and his mother, Lisa Eisenhart, participated in the January 6, 2021 incident at the Capitol.  Munchel is a thirty-year-old resident of Nashville, Tennessee.  He previously worked as a waiter and has twice been convicted for misdemeanor possession of marijuana in Georgia state courts. *See United States v. Munchel*, No. 1:21-CR-118-RCL, 2021 WL 620236, at *1 (D.D.C. Feb. 17, 2021).  Eisenhart is a fifty-seven-year-old resident of Woodstock, Georgia.  She has been employed as a nurse for approximately thirty years and has no prior criminal history. *Id.*; Eisenhart Mem. at 13.

On January 6, Eisenhart and Munchel attended President Trump's "Stop the Steal" rally to protest the election results.  Both wore tactical vests and Munchel had a taser, holstered on

3

his hip.  Munchel also wore his iPhone, mounted on his tactical vest, and used it to take a video of some of the day's events. Following the rally, Eisenhart and Munchel marched towards the Capitol.  *See Munchel*, 2021 WL 620236, at *2–3.  As they approached the Capitol, they milled around outside and talked with others. They met members of the Oath Keepers militia and Munchel bumped fists with one of them.  *Id.* at *2; Video at 11:56–12:05.

At some point while Munchel and Eisenhart were standing around, someone yelled out "they broke the line up there" and people began saying "let's go in."  Eisenhart told Munchel they should go in, but she added, "[w]e're going straight to federal prison if we go in there with weapons."  Video at 12:28–12:40. Munchel responded that he would not go into the Capitol, and Eisenhart suggested that they put "em" in their backpacks.  *Id.* Munchel and Eisenhart then moved across the crowd to an area where a backpack was stowed and Munchel stashed a fanny pack in the backpack.  *See Munchel*, 2021 WL 620236, at *2; Video at 16:00–16:25.  Munchel contends that the only weapon in the fanny pack was a pocketknife; the government suggests that other weapons could have been inside, perhaps even a firearm.  *See* Tr. of Dist. Ct. Detention Hr'g at 10.  Munchel kept his taser holstered on his hip.  *See Munchel*, 2021 WL 620236, at *2.

Subsequently, Eisenhart encouraged others to enter the Capitol, stating the tear gas "isn't bad" and repeatedly stating, "let's go in."  Video at 16:28–17:45.  Munchel and Eisenhart pushed their way through the crowd to continue towards the Capitol.  Munchel followed Eisenhart, often holding on to a strap on her back.  *E.g.*, *id.* at 17:45–23:00.  En route, Eisenhart encouraged a man who claimed to have "punched two of them in the face," telling him, "while everyone else is on their couch, you guys are training, and getting ready for it."  *Id.* at 23:56–

4

24:12.  Munchel told members of the crowd that "we're not playing f__ing nice no god damn more," that he is "f__ing ready to f__ sh__ up," and "I guess they thought we were playing." *Id.* at 25:18, 26:58–27:01, 36:53–36:56; Munchel Mem. at 11.  Additionally, when Eisenhart heard that Congress was "shut down" by tear gas she exclaimed that "they got tear-gassed, motherf__ers" and proclaimed it her "best day to know they got tear-gassed." Video at 30:08–30:29.  Directly in front of the Capitol and near an entrance, Munchel stated, this is "probably the last time I'll be able to enter the building with armor and . . . f__ing weapons." *Id.* at 36:29–36:35.

Munchel and Eisenhart entered the Capitol through an open door and stayed inside for approximately twelve minutes. *Id.* at 38:30–38:50 (entry); Munchel Mem. at 11.  Police officers were standing to the right of the door, not blocking their entry.  Munchel Mem. at 11 (citing to Video).  While walking through the Capitol, Munchel told members of the mob "don't break sh_," "no vandalizing sh__. We ain't no god damn Antifa, motherf__ers," and "you break sh__, I break you."  Video at 42:45, 43:20–43:43, 44:13–44:15.

Additionally, while inside, Munchel and Eisenhart spotted plastic handcuffs, known as "zip ties." *Munchel*, 2021 WL 620236, at *2; Video at 43:43.  Upon seeing the zip ties, Munchel shouted "Zip ties! I need to get me some of them motherf__ers." Video at 43:43–43:48.  Munchel took several zip ties and Eisenhart took one. *See* Munchel Mem. at 12.  Munchel and Eisenhart eventually made their way to the Senate gallery, both still carrying the zip ties, and Munchel still carrying his taser. *Munchel*, 2021 WL 620236, at *2; Gov't Mem. at 12 (pictures of Munchel in Senate gallery with zip ties).  Inside the gallery, Eisenhart chanted "Treason! Treason!" and Munchel looked down at the dais and said, "I want that f__ing gavel," referring to the Senate's artifact.

5

Video at 45:14–45:17, 47:21–47:23.  Munchel made no effort to steal the gavel.  *Id.* at 47:21–47:23; *Munchel*, 2021 WL 620236, at *2.

After leaving the gallery, Eisenhart told Munchel not to carry the zip ties, stating that they "need[ed] to get them out of [their] hands."  Video at 48:43–48:48.  Later, Munchel took some home with him to Tennessee.  *See Munchel*, 2021 WL 620236, at *2.  Eisenhart has claimed that she took the zip ties to keep them away from "bad actors."  *Id.*; Eisenhart Mem. at 3.

Eventually, Munchel and Eisenhart left the Capitol.  As they were exiting, Munchel said to nearby police officers, "Sorry, guys, I still love you."  Video at 49:27–49:29; Munchel Mem. at 13.

On the evening of January 6, a Metropolitan Police Department officer stopped Munchel and seized his taser.  *See Munchel*, 2021 WL 620236, at *3.[1]  The next day, as they packed their car to go home, both Eisenhart and Munchel spoke to the media.  Eisenhart stated:

> This country was founded on revolution. If they're going to take every legitimate means from us, and we can't even express ourselves on the internet, we won't even be able to speak freely, what is America for? . . .  I'd rather die as a 57-year-old woman than live under

---

[1] On January 5, a police officer had observed Munchel's taser and allowed him to keep it, ostensibly because it was legal to possess on the street in the District of Columbia.  *Munchel*, 2021 WL 620236, at *1.

6

oppression. I'd rather die and would rather fight.

Laura Pullman, *Trump*'s *Militias Say They Are Armed and Ready to Defend Their Freedoms*, THE TIMES (of London) (Jan. 10, 2021), https://www.thetimes.co.uk/article/trumps-militias-say-they-are-armed-and-ready-to-defend-their-freedoms-8ht5m0j70https://www.thetimes.co.uk/article/trumps-militias-say-they-are-armed-and-ready-to-defend-their-freedoms-8ht5m0j70 (attached to the Gov't Suppl. Mem. at 26). Munchel told the newspaper:

> We wanted to show that we're willing to rise up, band together and fight if necessary. Same as our forefathers, who established this country in 1776. . . . It was a kind of flexing of muscles. . . . The intentions of going in were not to fight the police. The point of getting inside the building is to show them that we can, and we will.

*Id.*

Later, Munchel and Eisenhart returned to Tennessee, and Eisenhart continued on to her home in Georgia. The FBI posted bulletins on the internet and in the media with photos of Munchel and Eisenhart from January 6, asking for the public's help in identifying them. On the morning of January 10, FBI agents executed a search warrant at Munchel's apartment. The agents found the tactical vest Munchel wore at the Capitol, zip ties, firearms, and a large quantity of loaded magazines. Munchel was licensed to possess those weapons. *See Munchel*, 2021 WL 620236, at *3. Soon after learning about the search, Munchel turned himself in. *Id.* at *4; Munchel Mem. at 15. Munchel also made arrangements for his attorney to give his iPhone to the FBI. Munchel Mem. at 15. Once Eisenhart

7

learned she was the target of a federal investigation, she spoke to a local FBI agent every day to determine whether there was a warrant for her arrest, and when the warrant issued, she self-surrendered.  *See Munchel*, 2021 WL 620236, at *4, *7; Eisenhart Mem. at 3.

Munchel and Eisenhart were charged in a complaint with unlawful entry, violent entry, civil disorder, and conspiracy. *See* Complaint, *United States v. Munchel*, No. 1:21-CR-118-RCL, 2021 WL 620236, ECF No. 1 (D.D.C. Feb. 17, 2021). Munchel and Eisenhart had pretrial detention hearings before Magistrate Judge Jeffrey Frensley in the Middle District of Tennessee.  Magistrate Judge Frensley concluded that neither Munchel nor Eisenhart were flight risks nor posed a danger to the community and issued release orders for both appellants with various conditions, including home detention, GPS monitoring, refraining from possessing firearms or dangerous weapons, and supervision by Pretrial Services.  *See* Jan. 22, 2021 Transcript ("Munchel Tr.") at 181, 186–89 (included in Munchel Suppl.); Jan. 25, 2021 Transcript ("Eisenhart Tr.") at 163, 164–66 (attached to Eisenhart Mem.).

Magistrate Judge Frensley briefly stayed both of his release orders, *id.* at 171; Munchel Tr. at 198–99, and the government promptly appealed both orders to the United States District Court for the District of Columbia.  Chief Judge Beryl A. Howell stayed both release orders pending appeal, *see* Stay Orders, ECF Nos. 4, 7, and ordered both appellants to be transported to D.C., *see* Transport Orders, ECF Nos. 5, 9. COVID-19-related complications slowed the appellants' transport to D.C.  *See* Status Report, ECF No. 18.  While their transports were pending, Eisenhart moved to rescind the stay or to conduct an immediate review of her detention, which Munchel joined.  *See* ECF Nos. 14, 15, 27.  Additionally, the government filed motions seeking review of Judge Frensley's

8

release orders.  *See* ECF Nos. 3, 6.  In the meantime, Munchel and Eisenhart were detained.[2]

Subsequently, on February 12, a grand jury sitting in the District of Columbia returned an indictment charging Munchel and Eisenhart with obstruction of an official proceeding; Munchel with unlawful entry while armed with a dangerous weapon, and violent entry while armed with a dangerous weapon; and Eisenhart with aiding and abetting unlawful entry while armed with a dangerous weapon, and aiding and abetting violent entry while armed with a dangerous weapon.  *See* Indictment, ECF No. 21; *Munchel*, 2021 WL 620236, at *7. On February 17, the District Court arraigned Munchel and Eisenhart on the indictment and the government made an oral motion for pretrial detention.  *See id.* at *4.  During the detention hearing in the District Court, the government proceeded by proffer rather than calling live witnesses.  In addition to what had been presented to Magistrate Judge Frensley, the government introduced the 50-minute videotape into evidence and proffered that after January 6, Munchel was in contact with a suspected member of the Proud Boys and was

---

[2] Even though Magistrate Judge Frensley had found that the government had not met its burden of proving dangerousness by clear and convincing evidence, the government sought and obtained an *ex parte* stay of that release order that resulted in the appellants being detained for three weeks without any court finding of dangerousness, notwithstanding the statute's mandate that review occur "promptly," 18 U.S.C. § 3145(a), and the statutory and constitutional requirement of a dangerousness finding, *see infra*. While COVID-19 issues caused a delay in the appellants' transport to the District of Columbia, the record does not indicate why a D.C. District Judge could not have heard this matter prior to February 17, even if the appellants were in another location.  Ultimately, this issue, while troubling, is not presented as a ground for reversal in this appeal.

9

told that he was too "hot" after he expressed interest in joining the group. *Id.* at \*6; Tr. of Dist. Ct. Detention Hr'g at 51.

Following the detention hearing, the District Court ordered both Munchel and Eisenhart to be detained pending trial, denied as moot Munchel and Eisenhart's motions seeking to rescind the stay of Judge Frensley's orders, and denied as moot the government's motion seeking review of Judge Frensley's orders. *See* Detention Orders, ECF Nos. 25, 26; *see also* ECF No. 27. The District Court concluded that both Munchel and Eisenhart were eligible for detention because they were charged with felonies while carrying a dangerous weapon, explaining that the indictment alleges that Munchel carried a dangerous weapon (the taser) and that Eisenhart aided and abetted Munchel and therefore she was liable as if she were the principal. *See Munchel*, 2021 WL 620236, at \*5, \*7.

Applying *de novo* review, the District Court determined that appellants were not flight risks but that detention was appropriate on the basis of dangerousness. *Id.* at \*5–8. The District Court concluded that appellants' history and characteristics weighed against detention but that the nature and circumstances of the charged offenses, the weight of the evidence, and the potential danger appellants pose to the community weighed in favor of detention. *Id.* The District Court further determined that neither appellant was likely to be deterred by release conditions. *Id.* at \*7, \*8.

Munchel and Eisenhart timely appealed. They contend that the District Court erred in not deferring to Magistrate Judge Frensley's factual findings as to their dangerousness. They also contend that the District Court inappropriately relied on a finding that they were unlikely to abide by release conditions to detain them, because that factor is applicable only to revocation of pretrial release. They also argue that the

10

charged offenses do not authorize detention, claiming that felonies involving possession of a weapon, rather than use, do not qualify for detention and, relatedly, that Munchel's taser is not a "dangerous weapon" within the meaning of the statute. Munchel and Eisenhart also object that several other defendants who participated in the insurrection have been released before trial, arguing that the conduct of those defendants is indistinguishable (or even worse) than their conduct on January 6. Finally, they contend that the District Court's determinations in support of detention were clearly erroneous.

## II.

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

The Bail Reform Act of 1984 authorizes one of those carefully limited exceptions by providing that the court "shall order" a defendant detained before trial if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). Here, the District Court held that both Munchel and Eisenhart should be detained on the basis of dangerousness.

In assessing whether pretrial detention is warranted for dangerousness, the district court considers four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the

11

nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4).  To justify detention on the basis of dangerousness, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community."  *Id.* § 3142(f).  Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety.

In *Salerno*, the Supreme Court rejected a challenge to this preventive detention scheme as repugnant to due process and the presumption of innocence, holding that "[w]hen the Government proves by clear and convincing evidence that an arrestee *presents an identified and articulable threat* to an individual or the community, we believe that, consistent with the Due Process Clause, a court may disable the arrestee *from executing that threat*."  481 U.S. at 751 (emphasis added).

## III.

We can readily dispatch with some of the appellants' arguments.

First, we conclude that we need not reach appellants' contention that the District Court erred in not deferring to Magistrate Judge Frensley's factual findings as to their dangerousness.  The statute concerning review of a Magistrate Judge's release order says nothing about the standard of the district court's review, *see* 18 U.S.C. § 3145(a), and we have

12

not squarely decided the issue.[3]  We need not break new ground
in this case, because as the appellants maintain in their briefing,
Munchel Reply Mem. 8, n.3, the government submitted
substantial additional evidence to the district judge that had not
been presented to the Magistrate Judge, including the 50-
minute iPhone video, a partial transcript of the video, and
several videos from Capitol CCTV.[4]  As a result, this was not
an instance where the District Court made its dangerousness
finding based on the same record as was before the Magistrate
Judge.  Here, the situation was more akin to a new hearing, and
as such, the issue before the District Court was not really
whether to defer (or not) to a finding made by the Magistrate
Judge on the same evidentiary record.  Thus, we conclude that
the issue complained of by appellants is not squarely before us
in this appeal and we see no need to reach it.

Second, we reject the argument that the District Court
inappropriately relied on a finding that appellants were unlikely
to abide by release conditions to detain them, because that
factor is applicable only to revocation of pretrial release.  The

_____

[3] This court stated long ago, in dictum, in a case arising under the
predecessor Bail Reform Act that district courts review such prior
determinations with "broad discretion."  *Wood v. United States*, 391
F.2d 981, 984 (D.C. Cir. 1968) ("Evaluating the competing
considerations is a task for the commissioner or judge in the first
instance, and then the judges of the District Court (where they have
original jurisdiction over the offense) have a broad discretion to
amend the conditions imposed, or to grant release outright, if they
feel that the balance has been improperly struck.").

[4] Below, the government contended that the 50-minute iPhone video
was presented to the Magistrate Judge in Eisenhart's detention
hearing.  ECF No. 41 at 2 & n.2.  However, it does not dispute the
appellants' claim that the partial transcript of the video and the
videos from Capitol CCTV were not presented to the Magistrate
Judge.

13

District Court's finding as to appellants' potential compliance is relevant to the ultimate determination of "whether there are conditions of release that will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(f) and (g). Indeed, other courts have found a defendant's potential for compliance with release conditions relevant to the detention inquiry. *See, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1092–93 (9th Cir. 2008) (explaining that release conditions require "good faith compliance" and that the circumstances of the charged offenses indicate "that there is an unacceptably high risk that [the defendant] would not comply. . . with the proposed conditions"); *United States v. Tortora*, 922 F.2d 880, 886–90 (1st Cir. 1990). While failure to abide by release conditions is an explicit ground for revocation of release in 18 U.S.C. § 3148(b), it defies logic to suggest that a court cannot consider whether it believes the defendant will actually abide by its conditions when making the release determination in the first instance pursuant to 18 U.S.C. § 3142.

Third, we reject Munchel and Eisenhart's arguments that the charged offenses do not authorize detention. Under 18 U.S.C. § 3142(f)(1)(E), detention is permitted if the case involves "any felony . . . that involves the *possession* or use of a . . . dangerous weapon." (emphasis added). Two of the charges in the indictment meet this description: Count Two— entering a restricted building "with intent to impede and disrupt the orderly conduct of Government business . . . while armed with a dangerous weapon," in violation of 18 U.S.C. § 1752(a)(1) and (a)(2) and 18 U.S.C. § 2 (aiding and abetting charge for Eisenhart); and Count Three—violent entry or disorderly conduct, again "while armed with a dangerous weapon," in violation of 40 U.S.C. § 5104(e)(1) and (e)(2) and 18 U.S.C. § 2. Indictment, ECF No. 21 at 2. The Bail Reform Act thus explicitly authorizes detention when a defendant is

14

charged with committing certain felonies while possessing a dangerous weapon, as is alleged in this indictment.[5]

## IV.

That leaves us with Munchel and Eisenhart's final two arguments: (1) that the District Court's determinations in support of detention were clearly erroneous; and (2) that several other defendants who participated in the insurrection have been released before trial, even though the conduct of those defendants is indistinguishable (or even worse) than their conduct on January 6. The first challenges the District Court's finding that no condition or combination of conditions of release could reasonably assure the safety of the community while these appellants await trial. Appellants did not raise the

---

[5] Eisenhart's argument that a taser is not a dangerous weapon—which Eisenhart raises for the first time in reply, and which Munchel seeks to adopt in his reply—is without merit. The relevant statute, 40 U.S.C. § 5104(a)(2)(B), defines the term "dangerous weapon" to include "a device designed to expel or hurl a projectile capable of causing injury to individuals or property. . . ." While the record contains no evidence or proffer as to how Munchel's taser operates, a taser is commonly understood as a device designed to expel a projectile capable of causing injury to individuals. *See Cantu v. City of Dothan*, 974 F.3d 1217, 1224–25 (11th Cir. 2020); *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) ("[A] taser uses compressed nitrogen to propel a pair of 'probes'—aluminum darts tipped with stainless steel barbs connected to the taser by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the taser delivers a 1200 volt, low ampere electrical charge. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." (internal alterations and quotation marks omitted)). Thus, at this stage, the evidence sufficiently demonstrates that Munchel's taser is a dangerous weapon under the statute.

15

latter argument below, so we decline to pass on it in the first instance and without the benefit of full briefing.

## A.

We review the District Court's dangerousness determinations for clear error. *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996); *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *see also United States v. Celis*, 608 F.3d 818, 843 (D.C. Cir. 2010). If, upon reviewing the record, it does not appear that the District Court considered substantial countervailing evidence that supported release when analyzing the detention factors, we sometimes remand for reconsideration rather than reverse. *See United States v. Nwokoro*, 651 F.3d 108, 110 (D.C. Cir. 2011) (remanding where the "district court [did not] demonstrate that it considered many of the facts apparent from the record before it").

In this case, the District Court found that because Munchel has limited criminal history and Eisenhart has none, their history and characteristics weighed against a finding that no conditions of release would protect the community. *Munchel*, 2021 WL 620236, at *6, *8. However, the District Court found that the nature and circumstances of the charged offenses, weight of the evidence, and danger to the community factors all weighed in favor of finding that no conditions of release would protect the community. *Id.* at *5–7 (Munchel) [6], *7–8

---

[6] Although the government presented evidence that Munchel was in contact with a member of the Proud Boys after January 6 and was

16

(Eisenhart). The crux of the District Court's reasoning was that "the grand jury alleged that [the appellants] used force to subvert a democratic election and arrest the peaceful transfer of power. Such conduct threatens the republic itself. . . . Indeed, few offenses are more threatening to our way of life." *Id.* at *5. Furthermore, because in media interviews Munchel showed no remorse and indicated that he would "undertake such actions again," while Eisenhart stated that she would rather "fight" and "die" than "live under oppression," the District Court found that both appellants were a danger to the republic and unlikely to abide by conditions of release. *Id.* at *6, *8 (quoting Pullman, *supra*). Nevertheless, we conclude that the District Court did not demonstrate that it adequately considered, in light of all the record evidence, whether Munchel and Eisenhart present an identified and articulable threat to the community. Accordingly, we remand for further factfinding. *Cf. Nwokoro*, 651 F.3d at 111–12.

## B.

The crux of the constitutional justification for preventive detention under the Bail Reform Act is that "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, . . . a court may disable the arrestee from executing that threat." *Salerno*, 481 U.S. at 751. Therefore, to order a defendant preventatively detained, a court

---

interested in joining the group, *id.* at *6, the District Court made no finding as to whether this evidence indicated that Munchel posed a danger to the community. It did, however, consider the evidence of Munchel's contact with the Proud Boys in its analysis of Munchel's history and characteristics, and determined that despite the evidence, Munchel's history and characteristics weighed against detention. *Id.*

17

must identify an articulable threat posed by the defendant to an individual or the community. The threat need not be of physical violence, and may extend to "non-physical harms such as corrupting a union." *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988) (quoting S. REP. NO. 98–225, at 3 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3195–96). But it must be clearly identified. *See Salerno*, 481 U.S. at 750 (noting that the Act applies in "narrow circumstances" where "the Government musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community"); *cf. Tortora*, 922 F.2d at 894 (Breyer, C.J., concurring) (reversing an order of release where the district court failed to "carefully analyze[] the danger [the defendant] posed"). Detention cannot be based on a finding that the defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness or risk of flight; otherwise the scope of detention would extend beyond the limits set by Congress. As we observed of the Bail Reform Act of 1966, "[t]he law requires reasonable assurance[,] but does not demand absolute certainty" that a defendant will comply with release conditions because a stricter regime "would be only a disguised way of compelling commitment in advance of judgment." *United States v. Alston*, 420 F.2d 176, 178 (D.C. Cir. 1969).

The threat must also be considered in context. *See Tortora,* 922 F.2d at 888 ("Detention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant. The inquiry is factbound." (internal citations omitted)). It follows that whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant. *Cf. Nwokoro*, 651 F.3d at 110–11 (noting that evidence "favoring appellant's pretrial release" included the fact that appellant had

18

no assets under his control, no ability to flee the country, and "no prior criminal record"). Whether the defendant poses a threat of dealing drugs, for instance, may depend on the defendant's past experience dealing, *see, e.g.*, *United States v. Briggs*, 697 F.3d 98, 102 (2d Cir. 2012), and her means of continuing to do so in the future, *see, e.g.*, *United States v. Henry*, 172 F.3d 921 (D.C. Cir. 1999) (unpublished).

Here, the District Court did not adequately demonstrate that it considered whether Munchel and Eisenhart posed an articulable threat to the community in view of their conduct on January 6, and the particular circumstances of January 6. The District Court based its dangerousness determination on a finding that "Munchel's alleged conduct indicates that he is willing to use force to promote his political ends," and that "[s]uch conduct poses a clear risk to the community." *Munchel*, 2021 WL 620236, at *6. In making this determination, however, the Court did not explain how it reached that conclusion notwithstanding the countervailing finding that "the record contains no evidence indicating that, while inside the Capitol, Munchel or Eisenhart vandalized any property or physically harmed any person," *id.* at *3, and the absence of any record evidence that either Munchel or Eisenhart committed any violence on January 6. That Munchel and Eisenhart assaulted no one on January 6; that they did not enter the Capitol by force; and that they vandalized no property are all factors that weigh against a finding that either pose a threat of "using force to promote [their] political ends," and that the District Court should consider on remand. If, in light of the lack of evidence that Munchel or Eisenhart committed violence on January 6, the District Court finds that they do not in fact pose a threat of committing violence in the future, the District Court should consider this finding in making its dangerousness determination. In our view, those who actually assaulted police officers and broke through windows, doors,

19

and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way. *See Simpkins*, 826 F.2d at 96 ("[W]here the future misconduct that is anticipated concerns violent criminal activity, no issue arises concerning the outer limits of the meaning of 'danger to the community,' an issue that would otherwise require a legal interpretation of the applicable standard." (internal quotation and alteration omitted)). And while the District Court stated that it was not satisfied that either appellant would comply with release conditions, that finding, as noted above, does not obviate a proper dangerousness determination to justify detention.

The District Court also failed to demonstrate that it considered the specific circumstances that made it possible, on January 6, for Munchel and Eisenhart to threaten the peaceful transfer of power. The appellants had a unique opportunity to obstruct democracy on January 6 because of the electoral college vote tally taking place that day, and the concurrently scheduled rallies and protests. Thus, Munchel and Eisenhart were able to attempt to obstruct the electoral college vote by entering the Capitol together with a large group of people who had gathered at the Capitol in protest that day. Because Munchel and Eisenhart did not vandalize any property or commit violence, the presence of the group was critical to their ability to obstruct the vote and to cause danger to the community. Without it, Munchel and Eisenhart—two individuals who did not engage in any violence and who were not involved in planning or coordinating the activities— seemingly would have posed little threat. The District Court found that appellants were a danger to "act against Congress" in the future, but there was no explanation of how the appellants would be capable of doing so now that the specific

20

circumstances of January 6 have passed.  This, too, is a factor that the District Court should consider on remand.

## C.

Finally, Munchel and Eisenhart argue that the government's proffer of dangerousness should be weighed against the fact that the government did not seek detention of defendants who admitted they pushed through the police barricades and defendants charged with punching officers, breaking windows, discharging tasers at officers, and with planning and fundraising for the riot.  *See* Munchel Reply Mem. at 9–12.  Appellants did not raise this claim before the District Court and the government did not substantively respond to it on appeal because Appellants raised it for the first time in Munchel's reply.  Whatever potential persuasiveness the government's failure to seek detention in another case carries in the abstract, every such decision by the government is highly dependent on the specific facts and circumstances of each case, which are not fully before us.  In addition, those facts and circumstances are best evaluated by the District Court in the first instance, and it should do so should appellants raise the issue upon remand.

\* \* \* \*

It cannot be gainsaid that the violent breach of the Capitol on January 6 was a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community.  *Cf. Salerno*, 481 U.S. at 748 ("[I]n times of war or insurrection, when society's interest is at its peak, the Government may detain individuals whom the government believes to be dangerous." (citations omitted)).  But we have a grave constitutional obligation to ensure that the facts and circumstances of each case warrant this exceptional

21

treatment.  Accordingly, we conclude that the appropriate resolution of this case is to remand the detention orders for reconsideration forthwith of the government's oral motion for pretrial detention.

*So ordered.*

KATSAS, *Circuit Judge*, concurring in part and dissenting in part:  These appeals present the question whether Eric Munchel and his mother, Lisa Eisenhart, may be detained pending trial for their participation in the riot at the United States Capitol on January 6, 2021.  The answer to that question does not turn on any generalized, backward-looking assessment of the rioters or the riot, as the district court erroneously suggested.  Instead, it turns on a specific, forward-looking assessment of whether Munchel and Eisenhart as individuals currently pose an unmitigable threat to public safety.  My colleagues and I agree on this critical point about the governing legal standard in these appeals.  We also agree that the district court failed to justify the detention of Munchel and Eisenhart on the record before it.  But whereas my colleagues remand for a do-over, I would reverse outright.[1]

The Bail Reform Act permits pretrial detention in only "carefully defined circumstances."  *United States v. Simpkins*, 826 F.2d 94, 95–96 (D.C. Cir. 1987).  To support detention, a court must find that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  In assessing public safety and flight risk, courts must consider four factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* § 3142(g).  For the

---

[1]  I join parts I to III of the Court's opinion.  I also agree with much of the legal analysis in part IV, including the proposition that those who assaulted police officers or forcibly breached Capitol security on January 6 "are in a different category of dangerousness" than those who, like Munchel and Eisenhart, only "cheered on" the disruption and "entered the Capitol after others cleared the way." *Ante* at 18–19.

2

public-safety determination, the government must prove all relevant facts "by clear and convincing evidence," *id.* § 3142(f)(2), and we review all relevant findings for clear error, *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996).

In this case, a magistrate judge concluded that neither Munchel nor Eisenhart is a flight risk and that neither would pose a safety risk if subjected to conditions including home detention, GPS monitoring, a ban on possessing firearms, a ban on travel to Washington, D.C., and supervision by the U.S. Pretrial and Probation Services System. Munchel Mag. Tr. at 177, 181, 185–89; Eisenhart Mag. Tr. at 152, 163, 164–66. The district court agreed that Munchel and Eisenhart do not present a flight risk, but found that no combination of release conditions would reasonably ensure public safety. *United States v. Munchel*, No. 1:21-CR-118-RCL, 2021 WL 620236, at *1, *5, *7 (D.D.C. Feb. 17, 2021). The court found that all but one of the subsidiary statutory factors weigh in favor of detention. *Id.* at *5–8.

In my view, the district court clearly erred in finding that the government satisfied its burden to prove an unmitigable threat to public safety by clear and convincing evidence. The court's errors infected both its assessment of the individual factors and its ultimate determination that Munchel and Eisenhart must be detained.

The first factor looks to both the "nature" and "circumstances" of the "charged" offense: "the former refers to the generic offense while the latter encompasses the manner in which the defendant committed it." *United States v. Singleton*, 182 F.3d 7, 12 (D.C. Cir. 1999). Munchel and Eisenhart have been charged with obstructing an official proceeding, *see* 18 U.S.C. § 1512(c)(2); entering a restricted building unlawfully or with the intent to impede government business, *see id.*

3

§ 1752(a)(1)–(2), (b); carrying a dangerous weapon on the Capitol grounds, *see* 40 U.S.C. § 5104(e)(1); and entering the Capitol with the intent to disrupt official business, *see id.* § 5104(e)(2). The district court described the charged offenses as "grave," asserted that "few offenses are more threatening to our way of life," and quoted at length from George Washington's Farewell Address. *Munchel*, 2021 WL 620236, at *5–7. But none of the charged offenses is a Class A or Class B felony, *see* 18 U.S.C. § 3559(a), none carries a mandatory minimum sentence, and none gives rise to a rebuttable presumption of detention.

The district court was primarily concerned with how Munchel and Eisenhart committed their offenses. In addition to the descriptions noted above, the court asserted that their conduct showed "a flagrant disregard for the rule of law"—and indeed "threatens the republic itself." *Munchel*, 2021 WL 620236, at *5–6. The court described Munchel as "willing to use force to promote his political ends" and as "[s]torming the Capitol to disrupt the counting of electoral votes." *Id.* at *6. Further, it found that Munchel's entering the Capitol "carried great potential for violence" because he was "armed with a taser," "carried plastic handcuffs," and "threatened to 'break' anyone who vandalized the Capitol." *Id.* But as the court itself acknowledged, "[t]he record contains no evidence indicating that, while inside the Capitol, Munchel or Eisenhart vandalized any property or physically harmed any person." *Id.* at *3.

A video recorded by Munchel—documenting what he and his mother did on January 6—confirms the more benign assessment. The video shows the following: Munchel and Eisenhart did not organize the election protest or the ensuing march to the Capitol, hatched no advance plan to enter the Capitol, and acted in concert with no other protestors. Nor did they assault any police officers or remove any barricades in

4

order to breach Capitol security. They decided to enter the Capitol only after others had already done so forcibly. By the time they made their way to the building, police were making no attempt to stop or even discourage protestors from entering. To go inside, Munchel and Eisenhart walked through an open door. While there, they attempted neither violence nor vandalism. They searched for no Members of Congress, and they harassed no police officers. They found plastic handcuffs by chance, but never threatened to use them. Munchel's threat to "break" anyone who vandalized the Capitol was intended to prevent destruction and was addressed to no one in particular. *See* Munchel iPhone Video at 43:41. For ten to twelve minutes, Munchel and Eisenhart wandered the halls of the Capitol, with Eisenhart leading the way and Munchel asking his mother what her plan was. At one point, they entered the Senate gallery. At another, as they entered what appears to be a hallway of offices, Munchel told his mother that "[w]e don't want to get stuck in here, this is not a place for us," which caused her to turn around. *Id.* at 42:11–14. Munchel and Eisenhart voluntarily left the building—while many other protestors remained and before the police began to restore order. Their misconduct was serious, but it hardly threatened to topple the Republic. Nor, for that matter, did it reveal an unmitigable propensity for future violence.

Turning to the second factor, the district court found that the "weight of the evidence" supported pretrial detention. *Munchel*, 2021 WL 620236, at *6, *8. The video in this case documents exactly what Munchel and Eisenhart did inside the Capitol. It forecloses any contention that pretrial detention is inappropriate because of uncertainty about whether the alleged conduct occurred. But as explained above, the conduct does not show that Munchel and Eisenhart pose an unmitigable future threat to public safety. The second factor thus moves the needle neither one way nor the other.

5

The district court next found that the defendants' "history and characteristics" do not support detention. *See Munchel*, 2021 WL 620236, at *6, *8. The government fails to challenge that finding—and for good reason. Munchel maintained employment until his arrest, has no history of violence, has no prior felony convictions, and is not a member of any anti-government or militia group. He has two prior misdemeanor convictions for possession of marijuana, which are both more than five years old, and there was no proof that he has ever failed to comply with any probation conditions imposed as a result. Munchel Mag. Tr. at 174–75. Eisenhart is 57 years old, has been a nurse for three decades, and has no criminal history. Both appellants voluntarily surrendered to the FBI. Munchel took affirmative steps to preserve the evidence in his cellphone and arranged to provide it to the government. *Id.* at 176. Before her arrest warrant had even issued, Eisenhart established daily contact with the FBI so that she could turn herself in as soon as it did. Eisenhart Mag. Tr. at 152. The third factor thus cuts strongly in favor of release.

In evaluating the "nature and seriousness" of any danger, the district court highlighted statements that Munchel and Eisenhart made to the media on January 7. Munchel said that "[t]he point of getting inside the building is to show them that we can, and we will," *Munchel*, 2021 WL 620236, at *6, while Eisenhart, invoking the American Revolution, said that she would "rather die and would rather fight" than "live under oppression," *id.* at *8. To the district court, these statements indicated that the defendants pose "a clear danger to our republic" and that Eisenhart is a "would-be martyr." *Id.* at *6, *8. But the defendants' actual conduct belied their rhetorical bravado. During the chaos of the Capitol riot, Munchel and Eisenhart had ample opportunity to fight, yet neither of them did. Munchel lawfully possessed several firearms in his home, but he took none into the Capitol. Munchel Mag. Tr. at 179,

6

182.   Indeed, before entering the Capitol, Munchel and Eisenhart stashed a knife inside a backpack that they left outside, precisely for fear of ending up in "federal prison." *See Munchel*, 2021 WL 620236, at *2.

Moreover, even if their comments indicate some willingness to engage in future protests or disruption, the Bail Reform Act permits detention only to prevent an "identified and articulable threat to an individual or the community." *United States v. Salerno*, 481 U.S. 739, 751 (1987). Here, the district court identified one such threat—that Munchel and Eisenhart would attempt "to stop or delay the peaceful transfer of power." *Munchel*, 2021 WL 620236, at *6, *8. But the transition has come and gone, and that threat has long passed. In the district court, the government warned of an upcoming protest scheduled for March 4. But that protest never materialized, and the government produced no evidence that Munchel and Eisenhart had been involved in its planning before their arrest. The government's gesturing towards the possibility of their joining future protests falls well short of any "identified and articulable threat." *Salerno*, 481 U.S. at 751.

After evaluating the four statutory factors, the district court turned to the ultimate question in the case—whether no release conditions would reasonably ensure public safety. The court worried that a "determined defendant" could "cut off an ankle monitor, ignore travel restrictions, elude a third-party custodian, unlawfully rearm, and endanger his community." *Munchel*, 2021 WL 620236, at *7. The court found that Munchel was such a defendant given his "brazen actions in front of hundreds of law enforcement officers" and his media comments. *Id.* It found that Eisenhart also qualified, because of her supposed "willingness to die for her cause." *Id.* at *8.

7

Yet the record shows otherwise. As explained above, Munchel and Eisenhart chose to trespass—not to engage in violence, much less fight to the death. Afterwards, both voluntarily surrendered to the FBI, as the district court recognized in concluding that neither posed a flight risk. *See Munchel*, 2021 WL 620236, at *5, *7. Munchel preserved and voluntarily turned over his cellphone video. Munchel Mag. Tr. at 176. Likewise, even after he was identified as a suspect, Munchel made no attempt to hide or remove the firearms that he lawfully possessed at his home. *Id.* at 181–82. As for the defendants' attitudes towards law enforcement, the video shows that police did not seek to discourage their entry into the Capitol through an open door, Munchel iPhone Video at 38:48; Munchel and Eisenhart made no attempt to harass officers while inside the Capitol; and, as they were preparing to exit, Munchel encountered an officer and said "Sorry, guys, I still love you," *id.* at 49:26. Finally, contrary to the district court's characterization of Eisenhart as a "would-be martyr," she specifically declined to bring a knife into the Capitol because of her expressed concerns with "federal prison." *See Munchel*, 2021 WL 620236, at *2. The defendants' other personal characteristics—which the district court acknowledged to weigh in favor of release—further indicate that they are likely to comply with release conditions.

In this case, the magistrate judge imposed strict release conditions. For Munchel, he required confinement at the home of a third-party custodian, GPS location monitoring, supervision by Pretrial Services, no possession of firearms, no travel to D.C., no excessive use of alcohol, no possession or use of any controlled substance, and drug testing if ordered by Pretrial Services. Munchel Mag. Tr. at 185–89. For Eisenhart he required home confinement, location monitoring, supervision by a third-party custodian, no possession of firearms, no travel to D.C., and submission to psychiatric

8

treatment if ordered by Pretrial Services.  Eisenhart Mag. Tr. at 164–66.  The district court gave no plausible explanation for why these stringent conditions would not reasonably ensure public safety.

Of course, we review dangerousness findings only for clear error, *Smith*, 79 F.3d at 1209, which requires affirmance if a district court's "account of the evidence is plausible in light of the record viewed in its entirety," *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985).  But while the standard of review here is favorable to the government, both substantive law and the standard of proof favor the defendants. The Bail Reform Act requires a showing that "no condition or combination of conditions" would even "reasonably assure" the safety of individuals or the community.   18 U.S.C. § 3142(e)(1).  And it requires this showing to be made by "clear and convincing evidence," *id.* § 3142(f)(2)—a heightened standard of proof under which the fact finder must "give the benefit of the doubt to the defendant," *United States v. Montague*, 40 F.3d 1251, 1255 (D.C. Cir. 1994); *see Addington v. Texas*, 441 U.S. 418, 424 (1979).  Putting it all together, because the record strongly suggests that Munchel and Eisenhart would present no safety risk if subjected to strict release conditions, the district court clearly erred in finding that the government had proved its case by clear and convincing evidence.

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U.S. at 755.  Because the district court clearly erred here, I would reverse its detention order and remand for the setting of appropriate release conditions.